Maureen V. Abbey
HENINGER GARRISON DAVIS, LLC
220 Saint Paul Street
Westfield, New Jersey 07090
Telephone: (908) 379-8475
Facsimile: (908) 301-9008
maureen@hgdlawfirm.com

**Attorney for Plaintiff**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | | |
|---|---|---|
| **SAWHORSE ENTERPRISES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.**_____ |
| v. | ) | |
| | ) | |
| **CHURCH & DWIGHT CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

Plaintiff, Sawhorse Enterprises, Inc. ("Plaintiff" or "Sawhorse"), by and through its undersigned counsel, files this Complaint against Defendant Church & Dwight Co, Inc. ("Defendant" or "C&D") as follows:

**NATURE OF THE ACTION**

1. C&D has induced Sawhorse into providing uncompensated services and unlawfully exploited these services as well as information that Sawhorse provided to it in confidence in order to reap enormous financial rewards for itself. Sawhorse, with the promise of partnership, taught C&D how to redesign, develop and market their TROJAN® product line and

assisted C&D in implementing a new strategy, developing new products, and creating an entirely new marketing, manufacturing and distribution division. On the back of Sawhorse's experience and expertise, C&D has reaped tens if not hundreds of millions of dollars in ill-gotten gains and billions of dollars in increased market capital.

2. From a legal perspective, this is a civil action for several contract claims. Plaintiff and Defendant entered into several contracts that allowed C&D to obtain an extremely valuable business that, among other things, develops, designs, manufactures, produces and distributes adult novelty items into large, mainstream channels. These agreements include: (1) a Confidentiality Agreement, (2) an Option Agreement, and (3) a Technology License Agreement. Defendant has breached all three contracts with respect to the performance of each individual contract as well as the implied covenant of good faith and fair dealing, and committed fraud against Sawhorse as detailed more fully below.

## PARTIES

3. Sawhorse is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1196 Cherry Avenue, San Bruno, California, 94066.

4. C&D is a corporation organized under the laws of the State of Delaware, with its principal place of business at 469 North Harrison Street, Princeton, New Jersey 08540.

5. C&D conducts its business activities with respect to adult novelty items under its TROJAN® brand name.

## JURISDICTION

6. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. Plaintiff is a resident of California. Defendant is a resident of New Jersey. The amount in controversy exceeds seventy-five thousand dollars ($75, 000).

7. The Court has personal jurisdiction over Defendant because: Defendant is a resident of the state of New Jersey and pursuant to the Technology License Agreement, defined below, Plaintiff and Defendant have agreed to personal jurisdiction in this forum.

## VENUE

8. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §§1391 and 1400(a).

## FACTUAL ALLEGATIONS

9. Sawhorse is a pioneer in the industry of adult sexual toys. Its Chief Executive, Dr. Sandor Gardos, PhD, is a licensed clinical psychologist and sex therapist. He was formerly a fellow at the College of Physicians & Surgeons of Columbia University in New York and a research scientist at the HIV Center for Clinical and Behavioral Studies. In his clinical practice (both private and hospital-based), Dr. Gardos has seen thousands of patients, with concerns that run the gamut of human sexual experience, both clinical and emotional. Dr. Gardos is a member of the American Association of Sex Educators, Counselors and Therapists, as well as the Society for the Scientific Study of Sexuality. He has written over a hundred articles, chapters, books, and other publications, and has served as the editor of the journal "Sexual Science." In addition to being published in leading journals in the fields of clinical psychology and sex therapy, he has been a regular columnist for WebMD, Yahoo!, AOL, About, MSN, and Match.com. Dr. Gardos has also been a regular guest on many nationally syndicated television and radio shows.

10. Sawhorse's products are primarily manufactured in China, an excessively regulated industry which in 2004 consisted of only 5 factories overseen by the Chinese Military and shrouded in secrecy by the Chinese government. Sawhorse cultivated a business relationship with all of these factories, as well as others, including the Manning Corporation ("G-HIGH"), on

or about 2004. Through this relationship Sawhorse was one of the first adult sexual toy manufacturers that did not rely on third party distribution, but rather were responsible for and actively directed the design, manufacture, and importation of adult sexual aids.

11. Part of Sawhorse's business model also focused on mainstreaming the industry away from a purely pornographic culture, to a scientific and medical one, focusing on the sexual health of individuals and couples alike, which brought adult sexual toys into a larger market. Due to Sawhorse's unique relationship with the aforementioned factories, Sawhorse independently designed its own products for an increased presence in the mainstream market.

12. On or about December, 2005, Dr. Gardos was contacted by Adam Glickman, a consultant for C&D's TROJAN® brand. Mr. Glickman questioned Dr. Gardos as to the source of Sawhorse's vibrating rings. Dr. Gardos refused to answer this question on the basis that his source was proprietary information. Mr. Glickman then proposed having Dr. Gardos meet with C&D executives to explore the possibility of a mutually beneficial relationship. Dr. Gardos agreed to this proposal.

13. Initially, Dr. Gardos entered into discussions with C&D regarding a new source for TROJAN® brand vibrating rings. During these discussions, C&D expressed an interest in possibly expanding beyond the existing line of vibrating rings to adult sexual toys, and attempted to engage Dr. Gardos in such conversations. Dr. Gardos refused to answer any questions relating to production, manufacturing, marketing, etc. without signing a Non-Disclosure Agreement.

14. On or about March 31, 2006, the Confidentiality Agreement ("Confidentiality Agreement") was finally signed after much insistence by Dr. Gardos. C&D took several weeks to produce the agreement after Dr. Gardos' request. During that time period while Dr. Gardos pressed for an agreement, C&D continued its attempts to get information from Dr. Gardos and

4

proposed that Dr. Gardos come to the TROJAN® division based on assurances of a forthcoming Confidentiality Agreement.

15. Dr. Gardos did make travel plans, but almost cancelled his reservations, as C&D had still not produced a confidentiality agreement at this point in time. C&D persuaded Dr. Gardos not to cancel his trip on the premise that he could at least come in and meet the division officers while he visited his parents in nearby New Jersey. Upon arrival at what Dr. Gardos thought was a simple meet-and-greet, C&D's general counsel produced a Confidentiality Agreement for his review. Not only surprised, but also feeling pressure to sign from C&D officers, Dr. Gardos, without counsel, signed the agreement, and proceeded to spend the rest of his day providing information.

16. Based on numerous assurances and incentives that C&D would be partnered with Sawhorse across a range of business sectors (distribution, ecommerce, product development, manufacturing, and marketing), Sawhorse continued working with C&D to now launch an entire TROJAN® branded adult sexual toy line, including everything from design and packaging to marketing copy and segmentation.

    a. Sawhorse conducted the feasibility analysis that demonstrated to C&D the potentially lucrative revenues that could be derived from the sale of vibrators and various other sexual health and enhancement aids.

    b. Sawhorse then created and provided a business plan and supporting market research for adult sexual toys sold through C&D's pre-contracted shelf space for TROJAN® brand products.

  c. Sawhorse leveraged its long term relationships to allow C&D to gain access to exclusive trade shows closed to the general public, revealed inside information, and introduced C&D to several industry leaders in both the United States and China.

  d. Sawhorse developed numerous products for C&D, including, but not limited to, dozens of designs and new prototypes for vibrators and other sexual enhancement aids.

  e. In addition to sourcing materials and providing proprietary motor specifications to C&D, Sawhorse leveraged its existing relationship with G-HIGH to plan, direct, and oversee the building of a new factory meeting ISO 9001 certification standards. Sawhorse also created and implemented the processes and procedures necessary to meet C&D's internal specifications and directives.

  f. In the end, Sawhorse provided C&D with not just the production capacity but also a complete supply chain and complex transport and import protocols and procedures that far exceeded those needed for the one product C&D ultimately acquired legitimately from Sawhorse.

17. While it was obtaining the means for generating substantial monetary gains from its use of the knowledge that Sawhorse and Dr. Gardos had provided, C&D repeatedly and strenuously assured Sawhorse that a beneficial, mutual partnership was immediately forthcoming.

18. After obtaining enormous amounts of proprietary information and expending massive amounts of manpower (without compensation) to help get the TROJAN® division of adult sexual toys operational, Sawhorse was offered a token Licensing Agreement that did not remotely reflect the representations and assurances made by C&D throughout this process, which

was the only reason that Sawhorse devoted such extensive resources to this endeavor (i.e. promises of substantial future returns).

19. A timeline of the parties' various agreements is as follows.

a. The Confidentiality Agreement was signed on March 31, 2006.

b. Based on the significant and substantial disclosures and expertise of Sawhorse and Dr. Gardos, C&D then proposed an Option Agreement that was designed to prevent Sawhorse from pursuing other business relationships with any other company regarding the sale or production of adult novelty items and to ensure that C&D would have full access to Dr. Gardos' expertise. The Option Agreement was signed May 17, 2006. The Confidentiality Agreement was expressly incorporated into the Option Agreement.

c. C&D thereafter only offered a royalty and technology license agreement on one token product alone (a finger vibrator), excluding any and all other designs, technology and products (which they nevertheless offered for sale and sold beginning in the latter half of 2008). The Technology License Agreement was signed on February 28, 2007.

20. Shortly after signing the token Technology License Agreement, Bruce Weiss, then Director and now Vice President of TROJAN®'s marketing division, told Dr. Gardos that C&D had hired new in-house personnel thereby effectively cutting out Sawhorse from any further involvement with TROJAN®'s subsequent line of vibrators and other sexual health and enhancement aids. Nevertheless, Weiss sought to induce Dr. Gardos into providing further information and knowledge necessary to facilitate this purported "transfer" with an offer of a consulting agreement that was later withdrawn once the transition was complete.

21. C&D's TROJAN® brand released the finger vibrator in 2008. And although the Technology Licensing Agreement specifically prohibited C&D from using Sawhorse's

Case 3:12-cv-06801-FLW-TJB Document 5695 Filed 11/02/12 Page 7 of 14 PageID: 1064

confidential information for any other purpose, the TROJAN® brand began releasing other products that were based on information provided to C&D by Sawhorse.

## COUNT I: BREACH OF
## THE CONFIDENTIALITY AGREEMENT

22. Plaintiffs incorporate by reference paragraphs 1 through 21 as if fully set forth herein.

23. Plaintiff and Defendant entered into a valid contract, the Confidentiality Agreement, on March 31, 2006.

24. Defendant breached this contract on or around 2009, by offering for sale adult novelty items still subject to the contract, disclosing Confidential Information to the public, and using Confidential Information for a purpose other than evaluation.

25. The breach has resulted in significant monetary losses to Plaintiff in the form of compensatory damages, incidental damages, and consequential damages.

26. Defendant's use and/or disclosure of Plaintiff's confidential information will continue to damage Plaintiff, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## COUNT II: BREACH OF
## THE OPTION AGREEMENT

27. Plaintiff incorporate by reference paragraphs 1 through 26 as if fully set forth herein.

28. Plaintiff and Defendant entered into a valid contract, the Option Agreement, on May 17, 2006.

29. The Option Agreement fully incorporated the Confidentiality Agreement as Exhibit B to the contract.

30. Defendant breached this contract on or around 2009, by offering for sale adult novelty items still subject to the contract, disclosing Confidential Information to the public, and using Confidential Information for a purpose other than evaluation, thereby breaching the incorporated Confidentiality Agreement.

31. The breach has resulted in significant monetary losses to Plaintiff in the form of compensatory damages, incidental damages, and consequential damages.

## COUNT III: BREACH OF THE
## TECHNOLOGY LICENSING AGREEMENT

32. Plaintiff incorporates by reference paragraphs 1 through 31 as if fully set forth herein.

33. Plaintiff and Defendant entered into the Technology Licensing Agreement, a valid contract, on February 28, 2007.

34. At all relevant times, Defendant has breached this contract by failing to pay all amounts as and when due. On information and belief, Defendant also breached the agreement by using technology, partners and facilities for unauthorized purposes.

35. The breach has resulted in significant monetary losses to Plaintiff in the form of compensatory damages, incidental damages, and consequential damages.

## COUNT IV: BREACH OF THE COVENANT OF
## GOOD FAITH AND FAIR DEALING

36. Plaintiff incorporates by reference paragraphs 1 through 35 as if fully set forth herein.

37. The Confidentiality Agreement, Option Agreement, and Technology Licensing Agreement are all valid contracts.

38. Defendant acted in bad faith, intentionally depriving Plaintiff of its benefits under the Confidentiality Agreement, Option Agreement and the Technology Licensing Agreement by disclosing and utilizing protected, shared information for its own profit goals.

39. Defendant intentionally entered into all three contracts with the bad faith intent of extracting all information related to, *inter alia*, the design, development, manufacture, marketing, distribution, and sale of adult novelty items from a leader in the field, without ever intending to justly compensate Plaintiff, or fulfill its agreements.

40. Defendant has nurtured an expectation of partnership in adult novelty item production with Plaintiff purposefully, then willfully breached all three agreements and severed all ties with Plaintiff once all desired information had been gathered.

41. The conduct of Defendant has directly caused significant loss and harm to Plaintiff.

## COUNT V: FRAUD

42. Plaintiff incorporates by reference paragraphs 1 through 41 as if fully set forth herein.

43. Defendant consistently misrepresented to Plaintiff that the Defendant was interested in a business partnership.

44. Defendant knew its promises and assurances of partnership with Plaintiff were false. On information and belief, Defendant had no intention of entering a business relationship of the nature promised.

45. Defendant kept giving promises and assurances in order to extract as much confidential information as possible from Plaintiff, with the intent that Plaintiff believed the exchange of information was in support of a future partnership.

46. Plaintiff relied on this promised partnership to its detriment, expending significant time and effort to move from the concept phase all the way through the first production batch for Defendant.

47. Upon witnessing the viability of the production batch and increase in profits, Defendant severed almost all ties with Plaintiff, and used the system that Plaintiff had built on the reliance of a partnership, to effectively run Plaintiff out of business.

48. Defendant acted willfully and maliciously in damaging Plaintiff and is liable for both actual and punitive damages.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

A. An adjudication that Defendant has breached the Option Agreement;

B. An adjudication that Defendant has breached the Confidentiality Agreement;

C. A grant of permanent injunction preventing Defendant from using and/or disclosing Plaintiff's confidential information;

D. An adjudication that Defendant has breached the covenant of good faith and fair dealing with respect to the Confidentiality Agreement;

E. An adjudication that Defendant has breached the Technology Licensing Agreement;

F. An adjudication that Defendant has committed fraud;

G. An award to Plaintiff of damages adequate to compensate Plaintiff for the Defendant's acts of breach and fraud together with prejudgment interest;

H. An accounting of monies owed to Plaintiff under the terms of the Technology License Agreement;

    I. Actual, exemplary and/or punitive damages; and,

    J. Any further relief that this Court deems just and proper.

Respectfully submitted this 2nd day of November, 2012.

                                   Maureen V. Abbey
                                   HENINGER GARRISON DAVIS, LLC
                                   State Bar No.: 20782005
                                   220 Saint Paul Street
                                   Westfield, New Jersey 07090
                                   Telephone: (908) 379-8475
                                   Facsimile: (908) 301-9008
                                   Maureen@hgdlawfirm.com

                                   Steven W. Ritcheson
                                   *Pro Hac Vice Application to be filed*
                                   HENINGER GARRISON DAVIS, LLC
                                   9800 D Topanga Canyon Boulevard # 347
                                   Chatsworth, California 91311
                                   Telephone: (818) 882-1030
                                   Facsimile: (818) 337-0383
                                   switcheson@hgdlawfirm.com

                                   Jacqueline Knapp Burt
                                   *Pro Hac Vice Application to be filed*
                                   HENINGER GARRISON DAVIS, LLC
                                   Vinings Main
                                   3621 Vinings Slope, Suite 4320
                                   Atlanta, Georgia 30339
                                   Telephone: (404) 996-0861
                                   Facsimile: (205) 547-5502
                                   jknapp@hgdlawfirm.com

                                   Dara T. Jeffries
                                   *Pro Hac Vice Application to be filed*
                                   HENINGER GARRISON DAVIS, LLC
                                   Vinings Main
                                   3621 Vinings Slope, Suite 4320

Atlanta, Georgia 30339  
Telephone: (404) 996-0867  
Facsimile: (205) 547-5502  
djeffries@hgdlawfirm.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that I will have the foregoing papers served on Defendant or Defendant's agent for service by personal service in accordance with the Local Rules and Federal Rules of Civil Procedure upon issuance of the summons by the Court.

                                                    s/ *Maureen V. Abbey*

Case 3:23-cv-08101-FLW-TJB Document 5695 Filed 11/02/2027 Page 14 of 14 PageID: 2714