UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | | |
|---|---|---|
| SAWHORSE ENTERPRISES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:12-CV-06811-FLW-TJB |
| v. | ) | |
| | ) | |
| CHURCH & DWIGHT CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF SANDOR GARDOS IN SUPPORT OF PLAINTIFF SAWHORSE ENTERPRISES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

I, Sandor Gardos, hereby declare as follows:

1.　My title is Chief Executive Officer of Plaintiff Sawhorse Enterprises ("Sawhorse"), and since the beginning, I have been responsible for the overall strategy of Sawhorse. I submit this declaration upon personal knowledge or information and belief.

2.　Sawhorse is a designer, manufacturer, importer, distributor and retailer of adult sexual toy products.

3.　I am a licensed clinical psychologist and sex therapist. I was formerly a fellow at the College of Physicians & Surgeons of Columbia University in New York and a research scientist at the HIV Center for Clinical and Behavioral Studies. In my clinical practice (both private and hospital-based), I have seen thousands of patients, with concerns that run the gamut of human sexual experience, both clinical and emotional. I am a member of the American Association of Sex Educators, Counselors and Therapists, as well as the Society for the Scientific Study of Sexuality. I have written over a hundred articles, chapters, books, and other

1

publications, and have served as the editor of the journal "Sexual Science."  In addition to being published in leading journals in the fields of clinical psychology and sex therapy, I have been a regular columnist for WebMD, Yahoo!, AOL, About, MSN, and Match.com and have been a regular guest on many nationally syndicated television and radio shows.

4. Sawhorse's products are primarily manufactured in China, an extensively regulated industry which in 2004 consisted of only 5 factories overseen by the Chinese Military and shrouded in secrecy by the Chinese government.  Sawhorse spent years locating and then cultivating a business relationship with all of these factories, as well as others, including the Manning Corporation ("G-HIGH"), beginning on or about 2004.  Through this relationship, Sawhorse was one of the first adult sexual toy manufacturers that did not rely on third party distribution, but rather were responsible for, and actively directed the design, manufacture, and importation of adult sexual aids.

5. A key part of Sawhorse's business model focused on mainstreaming the industry away from a purely pornographic culture, to a scientific and medical one, the emphasis being the sexual health of individuals and couples alike, with the goal of bringing adult sexual toys to a larger market and vastly increasing market share and revenue potential. The critical factor in our approach was not only Sawhorse's unique relationship with these Chinese factories, thereby allowing Sawhorse to independently design its own products, but also my personal expertise and credibility, which allowed for an increased presence in the mainstream market that was previously largely untapped.

6. On or about December, 2005, I was contacted by Adam Glickman, a consultant for C&D's TROJAN® brand.  Mr. Glickman questioned me as to the source of Sawhorse's vibrating rings.  I refused to answer this question on the basis that my source was proprietary

information.  Mr. Glickman then proposed that I have a meeting with C&D executives to explore the possibility of a mutually beneficial relationship.  I agreed to this proposal.

7. Initially, I entered into discussions with C&D regarding a new source for TROJAN® brand vibrating rings.  During these discussions, C&D expressed an interest in possibly going several steps further by having Sawhorse design unique rings for them, as well as assisting their expansion beyond rings to a far broader range of adult sexual toys.  I refused to engage in conversation about these matters or answer any questions related to production, manufacturing, marketing, etc. without a mutually signed Non-Disclosure Agreement.

8. For many weeks, C&D requested that I travel to their offices in New Jersey and meet with them, assuring me that a Confidentiality Agreement was forthcoming. I did ultimately make travel plans, but wound up almost cancelling them when C&D had still not produced a confidentiality agreement even when I was due to depart within days.  C&D ultimately did persuade me not to cancel my trip on the premise that I could, at least, come in and meet the division officers and simultaneously have an opportunity to visit my parents nearby in New Jersey.  Upon my arrival at C&D, at what I thought was a simple meet-and-greet, C&D produced a Confidentiality Agreement for my review.  Not only surprised, but also feeling pressure to sign from C&D officers, without counsel I signed the agreement, and proceeded to spend the rest of my day providing information to them.

9. The Confidentiality Agreement was signed on March 31, 2006.

10. Sawhorse conducted a feasibility analysis at C&D's request that demonstrated the potentially lucrative revenues that could be derived from the sale of vibrators and various other sexual health and enhancement aids.  This information, as well as the confidence that I would be

available to advise and assist them, played a major role in them deciding to launch this new line of products.

11.     Based on numerous assurances and incentives that C&D would be partnered with Sawhorse across a range of business sectors (distribution, ecommerce, product development, manufacturing, and marketing), Sawhorse and I continued working with C&D to now launch an entire TROJAN® branded adult sexual toy line, advising them on everything from design and packaging to marketing copy and sales strategy.

12.     Sawhorse then proceeded to create and provide significant and comprehensive business strategies and tactical plans, as well as supporting market research, for an integrated, multi-channel sales approach that took advantage of things like C&D's pre-contracted shelf space for TROJAN® brand products, as but one example.

13.     Based on the significant and substantial disclosures and expertise of Sawhorse and me, C&D then proposed an Option Agreement that was designed to prevent Sawhorse from pursuing other business relationships with any other company regarding the design, creation, sale or production of adult novelty items and to ensure that C&D would have full access to our expertise.

14.     The Option Agreement was signed May 17, 2006.

15.     The Confidentiality Agreement was expressly incorporated into the Option Agreement.

16.     Sawhorse also revealed inside information, as well as leveraged many of its long-term relationships in order to allow C&D to, among other things, gain access to exclusive trade shows that were closed to the general public, and introduced C&D to several industry leaders in

both the United States and China, which was instrumental in their future success by, as but one example, giving them the means to enter entirely new markets.

17.     During this time, Sawhorse developed numerous products for C&D, including, but not limited to, designs and new prototypes for vibrators and other sexual enhancement aids.

18.     In addition to sourcing materials and providing proprietary motor (as well as other) specifications to C&D, Sawhorse leveraged its existing relationship with G-HIGH to plan, direct, and oversee the building of a new factory designed with the goal of complying with ISO 9001 certification standards.  Sawhorse simultaneously also planned and implemented the processes and procedures necessary to meet C&D's internal specifications and directives.

19.     In the end, Sawhorse provided C&D with not just the production capacity but also a complete supply chain incorporating complex transport and import/export protocols as well as procedures that far exceeded those needed for the one product C&D ultimately acquired legitimately from Sawhorse.  For example, I was aware that certain raw materials or component parts, such as raw plastics, should be sourced from suppliers outside of China, and that even local suppliers needed to be vetted very carefully.  I provided all of our painstakingly researched final determinations regarding suppliers to C&D.

20.     While it was obtaining the means for generating substantial monetary gains from its use of the knowledge that Sawhorse and I had provided, C&D repeatedly and strenuously assured Sawhorse that a beneficial, mutual partnership was immediately forthcoming.

21.     After obtaining and providing enormous amounts of proprietary information and expending massive amounts of manpower (without compensation) to help get the TROJAN® division of adult sexual toys operational, Sawhorse was offered but a token Licensing Agreement that did not remotely reflect the representations and assurances made by C&D throughout this

process, which was the only reason that Sawhorse devoted such extensive resources to this endeavor (i.e. promises of substantial future returns).

22. Ultimately, despite Sawhorse's vast contributions, without which there would probably be no Trojan Vibrations product line today, C&D only offered a royalty and technology license agreement for a single token product (a finger vibrator), excluding any and all other designs, technology and products (which they nevertheless offered for sale beginning in the latter half of 2008).

23. The Technology License Agreement was signed on February 28, 2007.

24. Shortly after signing the token Technology License Agreement, Bruce Weiss, then Director and later Vice President of TROJAN®'s marketing division, told me that C&D had hired new in-house personnel for the design, engineering and development of sex toys, and were also currently establishing a more robust advisory board comprised of noted sex researchers and therapists (many of whom I had introduced them to), as well as hoping to fund a number of university studies to replicate what I had already given them, thereby effectively cutting out Sawhorse from any further involvement with TROJAN®.  Nevertheless, Weiss sought to induce me into providing additional information and knowledge they lacked and found necessary to facilitate this purported "transfer" by the offer of a consulting agreement (which was subsequently withdrawn once the transition was complete and felt they no longer required my guidance, except for the instances shortly thereafter where they needed my assistance in undoing and fixing the problems that arose now that I was no longer guiding them).

25. C&D's TROJAN® brand released the finger vibrator in 2008.  While the Technology Licensing Agreement specifically prohibited C&D from using Sawhorse's

confidential information for any other purpose, the TROJAN® brand began releasing other products that were based on information provided to C&D by Sawhorse.

26. To date, I have never been compensated by C&D for my consulting services nor has Sawhorse received any payments for the monumental amount of work it undertook and the resulting contributions and rewards it reaped for C&D.

27. Sawhorse has only received royalty payments from C&D for sales of one product (the "Finger Vibe") and, despite numerous attempts to receive an accurate accounting, it has been impossible to ascertain whether even those payments accurately reflect the properly owed amounts.

28. It should also be noted that Sawhorse was a successful business generating sales slightly over six million dollars per year for fiscal year 2005.

29. In contrast, in the most recent year, Sawhorse's sales were merely just under five hundred thousand dollars for fiscal year 2012.

30. Much of this decline is directly related to the dedication and commitment that Sawhorse made in assisting C&D in launching its new product line, to the detriment of its own thriving business. When coupled with the fact that all of this work was done, as previously stated, entirely without compensation, it is easy to see how this led to the great suffering and losses Sawhorse subsequently, and continues to, experience.

31. Sawhorse was led to believe that it could reasonably expect up to $45 million a year in additional revenue once this new product line was fully developed. This income would be a result of numerous exclusive (and non-exclusive) joint projects and partnership. For example, it was my understanding that Sawhorse would handle all product development of adult sex toy products for C&D (and Sawhorse made every effort to accomplish this goal and prepare for the

future). C&D did not reciprocate or honor its commitments, and instead, chose to use Sawhorse's and my extensive know-how and resources (as well as specialized skills and expertise) to reap all of the benefits with any recompense.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated this 29th day of January 2013, at San Francisco, California.

_____
Sandor Gardos